Last block. Last block? That's a good move, eh? It's got some weight. His last answer reminded me that when he turns around, well, there's that. He's so good. He's so good. He's so good. Good morning. How are you? I'm Scott Levy. Thank you. I'm behind. I represent the Relators Appellants Susan Newman and Montessone Bott. Speak right up. Welcome to the mic. Speak right up. The issue today is whether the Higher Education Act and implementing regulations permit enrollment counselors at for-profit schools to have a financial interest in whether or not a student enrolls at such a for-profit school. In this case, the Relators were enrollment counselors who were required to sign employment contracts that provided their salary, and it stated the minimum number of students that the employment counselors must enroll in order to keep their job and their salary. Would it be inappropriate for any educational institutions subject to the provisions of these acts to hire recruiters, the mere fact of hiring recruiters? Is there anything wrong with that? Certainly there's nothing wrong with hiring recruiters. The statute says... That's all I asked. Is there anything wrong with the mere act of hiring recruiters? The designation as a recruiter, no. There's nothing wrong with that. And is there anything wrong with paying them a salary? As long as the salary... Is there anything wrong  There's nothing wrong in it of itself of paying them a salary. And is there anything wrong on offering them promotions based on success? If the success means recruiting a minimum number of students, it's absolutely prohibited by the statute. What the statute prohibits is the payment of bonuses directly tied to the number of students brought in. Isn't that the fundamental rub? It is, Your Honor, but the statute also says indirectly tied to the success of securing enrollments. So the recruiter cannot have a financial stake in whether the candidate being interviewed elects to enroll at that school. This is not a traditional non-profit institution. So a college can hire recruiters and pay them a salary, but it would be impermissible in your view, for example hypothetically, to dismiss a recruiter who brought in no recruits, if you will, at all. My son signs up with one of these colleges as a recruiter. He's going to be paid $65,000 a year. He works for a year. He produces absolutely no students who apply for financial aid to enroll at the institution. The college could not fire him without running afoul of the law. If he was fired solely because he didn't enroll, if that was the sole criterion, correct. That would be impermissible in your view. What exactly criteria would you have for a recruiter except recruiting? I mean, what is it, you know, being handsome or sort of being what? I mean, this is the job, right? The statute is providing money for educational institutions and it prohibits the recruiter from having a financial stake in whether that student elects to enroll. If an enrollment counselor at Berkeley is interviewing a number of students. If you take that literally, which I think you are trying to do, you could never have any performance criteria for that particular job. Every other job in the economy, people get graded to some extent on well, except out of the three judges, on There's that. There's that, right. On how much work you produce and how well you do it. I mean, you get promotions and you get retained. If you have the kind of job where you can be fired, you know, a few years back we, the people of California, fired the governor of California because they weren't happy with his performance, as you might recall. And so almost everybody in the economy is subject to that kind of constraint. And you're saying this is the one job where they can't consider how well you're doing your job in deciding whether or not you keep your job or whether or not you get a promotion or whether you get a raise or anything like that. Is that your position? The money is not provided to satisfy the normal business model. This money is provided for education. And But you still have to have people you know, if you're spending the government's money, you have to have some assurance or some quality control that that money is being spent on people who are efficient and effective in doing the job for which they're hired. Now, you may disagree with that, but then we have regulations that take this and maybe the statutory language could be read as extremely as you like to read it, but then we have regulations that say that this is okay. What do you do with those regulations? The regulation goes to the fact question of whether the schools knew that they were not permitted to have their their recruiters receive a financial incentive to increase enrollments at that school. Well, how could they have SIENTA? How could they have if they have regulations? Even if the regulations turn out to be no good, which you argue, but they're still regulations. These people still rely on them. How could you prove SIENTA? In this particular case, an amendment was offered in 2001 attempting to amend some weakening of this statute and that amendment passed the House and the Career College Association sponsored that amendment. A number of their schools were under suit at the time and that wasn't disclosed to the House and the bill was passed but due to the non-disclosure the Senate did not act on the companion Senate bill to amend this statute in 2001. Subsequent to that the industry the Career College Association being the Trade Association prevailed upon the Department of Education to make the changes that were being offered in the statute. There was knowledge these committee reports from these bills were filed in the record in other lawsuits in support of a motion to dismiss on the grounds that it was not a statute that should be enforced in its full vigor. So my position is there was actual notice in that we would be able to develop that. How do you reconcile your mandatory minimum quota argument with respect to 1232A statement that no provision of any program shall be construed to exercise a direction over the personnel of the institution? The Senate report on the incentive compensation statute very clearly explained that the Federal Government has no say whatsoever in the administration and the academic standards of any recipient of Federal Student Financial Aid. I'm talking about the personnel of the institution the recruiter I'm specifically zeroing in on. Specifically why can't an institution say look if someone is a hot shot recruiter we want to give them more money than a person who is just an average recruiter. What's wrong with that? And that's the normal business practice you expect in industry. The government is simply not going to pay for that. Okay so your position is that if an institution has a crackerjack recruiter that they can't recognize his superior employment ability. They can't compensate him based on his success at generating enrollments for the institution. In the Medicare context it's perfectly clear that a provider cannot refer a patient who needs blood work to a laboratory he has an interest in. That analogy is not apt. You're telling, if I hear you correctly, that all recruiters then are created equal even if some of them are really good and recruit students who become Phi Beta Kappas and double PhDs as recruiters that just recruit a lot of people and they all flunk out after their freshman year. That's what I hear you saying isn't it? You're saying the institution can't make a distinction between recruiters who are really crackerjacks and those who are just average or below average. Well to respond to your Phi Beta Kappa analogy, if Stanford and Berkeley are competing for a dollar student, the recruiter doesn't have a financial incentive in whether the recruiter at either school lacks any financial motivation to get that student to its university. In this case, in these for-profit schools, the recruiter has a personal financial interest in whether the candidate enrolls. The Senate report said they wanted that absolutely eliminated. Thank you. Your Honor's time. Good morning. My name is Tim Hatch. How are you Mr. Hatch? I'm very good, thank you, Your Honor. Anything you've heard this morning that was not adequately covered in your brief? No, Your Honor. Thank you. The case just now, you will stand submitted. You are adjourned. This court for this session adjourns.  I do. I can get that one. Let's just get these back. Those must be pockets. I hope I can always make sure it's out.
judges: Kozinski, Hawkins, Cowen